IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-cr-00073-DKW |
| Plaintiff, | |
| vs. | **ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE** |
| NATHAN YUEN GRIT LUM, | |
| Defendant. | |

Inmate Nathan Lum filed a motion pursuant to 18 U.S.C. § 3582(c)(1), Dkt. No. 47, requesting that this Court reduce his term of imprisonment to "time served" due to his current health conditions and his concerns about "the growing COVID-19 pandemic." *Id.* at 2. Because Lum's health issues and the state of affairs at the facility where he is incarcerated do not amount to "extraordinary and compelling" circumstances, and in light of the fact that Lum has served less than 4 months of his 30-month term of imprisonment, Lum's motion is DENIED.

## FACTUAL & PROCEDURAL BACKGROUND

Lum pled guilty to one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1); and one count of failure to file a tax return in violation of 26 U.S.C. § 7203. *See* Dkt. No. 27 at 3–4, 7. On January 29, 2020, this Court sentenced Lum to a total term of 30 months' incarceration and a one-year term of supervised release, Dkt. Nos. 40, 41, a sentence that was below the guideline range. *See* Dkt.

No. 42 at 3.   In imposing this sentence, the Court adopted the presentence investigation report (PSR) in full, Dkt. No. 42 at 1, which indicates Lum is 5 feet 11 inches tall and weighs 230 pounds (Body Mass Index of 32.1); has high blood pressure, high cholesterol, "borderline diabetes," asthma, chronic back pain, and low testosterone; was previously hospitalized in October 2019 for sepsis, secondary to group A strep pyogenes bacteremia and "gouty arthritis" of the right knee and ankle; underwent a catheter ablation procedure in January 2020 to correct symptomatic chronic atrial fibrillation; takes seven different medications; and is now 63 years of age.  *See* Dkt. No. 38 at 2, 15; *see also* Dkt. No. 63 at 2–5.  The PSR also notes that Lum has no history of mental or emotional problems.   Dkt. No. 38 at 15.  At the sentencing hearing, the Court allowed Lum to self-surrender to a facility to be designated by the Federal Bureau of Prisons (BOP) on March 11, 2020, Dkt. No. 41 at 2, which he did.

Lum is currently incarcerated in the minimum-security satellite camp at USP Lompoc in Santa Barbara County, California.[1]  Having served less than four months of his sentence, Lum is scheduled to be released on April 27, 2022.  *Id.*

On April 6, 2020, Lum's counsel sent a letter to the warden at USP Lompoc, requesting that Lum be released to home confinement for the remainder of his term of incarceration, or that the warden file a motion for compassionate release pursuant

---

[1]*Find an Inmate*, BOP, https://www.bop.gov/inmateloc/ (last visited June 23, 2020).

to 18 U.S.C. § 3582(c)(1)(A).  Dkt. No. 47-4 at 1, 5.  Lum's request was denied by letter dated April 14, 2020.  Dkt. No. 47-6 at 4.

## LEGAL STANDARD

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (alterations in original) (quoting 18 U.S.C. § 3582(b)).  Such circumstances must be "expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure."  *See* 18 U.S.C. § 3583(c)(1)(B); *see also Dillon*, 560 U.S. at 827, 831; *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003).  Congress carved out such an exception in 18 U.S.C. Section 3582(c)(1), as amended by the First Step Act of 2018 (FSA), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (2018).[2]  Under Section 3582(c)(1), courts may "modify a term of imprisonment" where, as here, the inmate files a motion, if three requirements are satisfied:

> (1) the inmate "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion" on behalf of the inmate "or the lapse of 30 days from the receipt of such a request" by the relevant warden;[3]

---

[2]The FSA amended the *procedural requirements* under Section 3582(c)(1)(A) to permit inmates to directly petition courts for a sentence reduction, whereas pre-amendment, an inmate could only petition the BOP Director, who then had the discretion to move the court to reduce the inmate's sentence based upon "extraordinary and compelling reasons."  *See* FSA § 603(b), 132 Stat. at 5239; U.S.S.G. § 1B1.13 cmt. n.4.; *see also United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).
[3]The Government does not contest that Lum has satisfied the statutory exhaustion requirements.  Dkt. No. 52 at 2.

(2) the inmate has established that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and

(3) the court has "consider[ed] the factors set forth in [18 U.S.C. Section] 3553(a)" and found that the inmate is "not a danger to the safety of any other person or the community, as provided under [18 U.S.C. Section] 3142(g)."

*See* 18 U.S.C. § 3582(c)(1); U.S.S.G. § 1B1.13 (policy statement). The inmate bears the burden of establishing the requirements for a sentence reduction by a preponderance of the evidence. *See, e.g.*, *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998); *see also United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *Walton v. Ariz.*, 497 U.S. 639, 650 (1990) (holding that a defendant's due process rights "are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency."), *overruled on other grounds by Ring v. Ariz.*, 536 U.S. 584, 609 (2002).

## **DISCUSSION**

The crux of the parties' dispute centers on the second and third requirements for a sentence reduction under Section 3582(c)(1), as outlined above. For the reasons that follow, Lum has satisfied neither of these two requirements.

## I.    **Extraordinary and Compelling Reasons**

Section 3582(c)(1) permits a sentence reduction only upon a showing of "extraordinary and compelling reasons," and only if "such a reduction is consistent

- 4 -

with applicable policy statements issued by the Sentencing Commission" (the "Commission").  Lum has failed to make the requisite showing because he is not suffering from a condition that elevates his risk of becoming seriously ill from COVID-19 and, if Lum did become infected, nothing suggests Lum's ability "to provide self-care within the . . . correctional facility" would be "substantially diminishe[d]" such that he would "not [be] expected to recover."  *See* U.S.S.G. § 1B1.13 cmt. n.1(A).

### A.    The Commission's Commentary in U.S.S.G. § 1B1.13 Defining "Extraordinary and Compelling" is Binding on Federal Courts

Congress did not delineate the bounds for what constitutes "extraordinary and compelling," except to state that "[r]ehabilitation of the defendant alone" is not enough.  28 U.S.C. § 994(t).  Instead, Congress directed the Commission to promulgate policy statements "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  *Id.*  The Commission did just that under Application Note 1 to U.S.S.G. § 1B1.13, albeit prior to the enactment of the FSA.  The Commission outlined the following four categories of circumstances that may constitute "extraordinary and compelling reasons" for a sentence reduction:

(A) the inmate is "suffering from a terminal illness," or a "serious" physical or cognitive condition "that substantially diminishes" the inmate's ability "to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover";

(B) the defendant is at least 65 years old, is "experiencing a serious deterioration in physical or mental health because of the aging process," *and* "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less";

(C) family circumstances involving "the death or incapacitation of the caregiver of the defendant's minor child," or the "incapacitation of the defendant's spouse or registered partner," leaving the inmate as "the only available caregiver for the spouse or registered partner"; or

(D) "[a]s determined by the Director of the [BOP]," in the inmate's case there is "an extraordinary and compelling reason other than, or in combination with," the other three reasons described.

*See* U.S.S.G. § 1B1.13 cmt. n.1.

Several district courts have concluded (as Lum urges this Court to do) that because the policy statement is "outdated" and does not account for the fact that an inmate may now seek relief directly from the court,[4] the definition of "extraordinary and compelling" is no longer limited to the examples set forth in the Commission's policy statement above, and courts are free to independently make that determination.[5] Dkt. No. 47-1 at 12–14. The Court is not persuaded.

Courts are not at liberty to treat the Commission's commentary as merely "persuasive," "of only limited authority," or "not binding on the federal courts." *Stinson v. United States*, 508 U.S. 36, 39, 44–47 (1993) (citation omitted). In

---

[4]The Commission "has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners." *See, e.g.*, *Brown*, 411 F. Supp. 3d at 449 (citations omitted)).

[5]*Rodriguez*, 424 F. Supp. 3d at 681 (collecting cases); *United States v. Singui*, No. 212CR00851CAS1, 2020 WL 2523114, at *4 (C.D. Cal. May 18, 2020) (collecting cases).

*Stinson*, the Supreme Court announced "the standard that governs the decision whether particular interpretive or explanatory commentary is binding." *Id.* at 43. There, the Court explained:

> The Sentencing Commission promulgates the guidelines by virtue of an express congressional delegation of authority for rulemaking, and through the informal rulemaking procedures. Thus, the guidelines are the equivalent of legislative rules adopted by federal agencies. The functional purpose of commentary (of the kind at issue here) is to assist in the interpretation and application of those rules, which are within the Commission's particular area of concern and expertise and which the Commission itself has the first responsibility to formulate and announce. In these respects this type of commentary is akin to an agency's interpretation of its own legislative rules. As we have often stated, provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation."

*Stinson*, 508 U.S. at 44–45 (internal citations omitted) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). Thus, the Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38.[6]

Here, the FSA only amended the *procedural requirements* under Section

---

[6]Although *Stinson* was decided before *United States v. Booker*, 543 U.S. 220, 246 (2005), in which the Supreme Court held that the Guidelines are advisory, not mandatory, the Supreme Court later held in *Dillon* that *Booker* is inapplicable in sentence-modification proceedings under 18 U.S.C. § 3582(c)(2) because such proceedings are fundamentally different, *see Dillon v. United States*, 560 U.S. 817, 828–30 (2010), and, as such, the relevant Guidelines policy statement "constrained" courts. *See id.* at 825–27. The same rationale applies to Section 3582(c)(1), the companion statutory provision to the one addressed in *Dillon*.

3582(c)(1).  *See supra* n.2.  An inmate may now personally petition a court under Section 3582(c)(1).  The mere fact that the Commission has not accounted for this change in U.S.S.G. § 1B1.13 simply means a court must nevertheless entertain a motion from an inmate.  But this does not nullify the Commission's entire policy statement or the commentary defining "extraordinary and compelling," nor does it somehow render that guidance "outdated."  *See* 18 U.S.C. § 3553(a)(5) (any "pertinent policy statement" is to be considered "subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into the amendments issued under section 994(p) of title 28.").  Considering the FSA's purely procedural amendment to Section 3582(c)(1), the amendment has no effect on the Commission's definition of "extraordinary and compelling."  Indeed, Congress did not alter the meaning of "extraordinary and compelling" in the statute, nor did it revoke the Commission's authority to define that phrase.  *See Mistretta v. United States*, 488 U.S. 361, 393–94 (1989) (Congress may "revoke or amend any or all of the Guidelines" by statute "at any time").

Therefore, because Application Note 1 to U.S.S.G. § 1B1.13 does not run afoul of the Constitution or a federal statute, and is not "plainly erroneous or inconsistent" with Section 1B1.13, the Commission's "commentary is a binding interpretation of the phrase '[extraordinary and compelling].'"  *Stinson*, 508 U.S. at

47; *see also Dillon*, 560 U.S. at 824 (explaining that a district court's discretion to modify a sentence under Section 3582(c)(2) is "constrained by the Commission's statements").[7]  In so holding, the Court joins the numerous district courts that, for various reasons, "continue to follow the guidance of the Sentencing Commission's policy statement limiting the scope of 'extraordinary and compelling reasons' that warrant compassionate release under § 3582(c)(1)."[8]

## B.    Analysis: Extraordinary and Compelling Reasons

Lum argues that "extraordinary and compelling reasons" justify reducing his sentence to time served because he is at risk for severe illness or death from COVID-19 while incarcerated at USP Lompoc's satellite camp.  Dkt. No. 47-1 at 11.  In that regard, the only relevant "extraordinary and compelling" scenario identified by the Commission is subpart (A) of the Commission's application note.  *See* U.S.S.G.

---

[7]Numerous courts have appropriately turned to *Stinson* and reached the same conclusion.  *See, e.g.*, *United States v. Garcia*, No. 4:05-CR-40098, 2020 WL 2039227, at *3–5 (C.D. Ill. Apr. 28, 2020); *United States v. Sandoval*, No. CR14-5105RBL, 2020 WL 3077152, at *3–4 (W.D. Wash. June 10, 2020) (citing nine other decisions); *United States v. Rollins*, No. 99 CR 771-1, 2020 WL 3077593, at *1–2 (N.D. Ill. June 10, 2020) (explaining further that Application Note 1(D) to U.S.S.G. § 1B1.13 is not inconsistent with § 3582(c)(1)(A)(i) because it may still be "applie[d] with full force if the *Director* invokes it in moving for a sentence reduction" and the "fact that Note 1(D) is unavailable if the *defendant* moves for a sentence reduction does not render it inconsistent with § 3582(c)(1)(A)(i); rather, Note 1(D) is simply inoperative in that circumstance").

[8]*See, e.g.*, *Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838, at *8 (W.D. Wash. Apr. 10, 2020); *United States v. Eberhart*, No. 13-CR-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *2 (E.D. Wash. March 31, 2020); *United States v. Gross*, No. 2:04-CR-032-RMP, 2019 WL 3538967, at *2 (E.D. Wash. Aug. 2, 2019); *United States v. Shields*, No. 12-CR-00410-BLF-1, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019).

§1B1.13 cmt. n.1(A).[9]  The Court concludes, however, that Lum has not shown that such circumstances exist.

Although the Court acknowledges that there is a heightened risk for the virus to spread in correctional facility environments,[10] standing alone, these concerns about possible exposure to COVID-19 in the abstract are not enough to warrant an inmate's early release.  *See, e.g.*, *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838, at *7 (W.D. Wash. Apr. 10, 2020) (collecting cases).  That type of general concern is shared by the public at large, as well as all incarcerated individuals.

Rather, to establish "extraordinary and compelling reasons," consistent with Application Note 1 to U.S.S.G § 1B1.13, stemming from the current coronavirus pandemic, an inmate must necessarily establish the following three elements by a preponderance of the evidence: (1) the inmate is "suffering from a terminal illness," or a "serious" physical or cognitive condition; (2) that condition elevates the inmate's risk of becoming seriously ill from COVID-19; and (3) if the inmate were to contract COVID-19, the inmate's ability "to provide self-care within the . . .

---

[9]Lum does not contend that the Director of the BOP has determined that there exists in this case some "other" extraordinary or compelling reason for a reduction in sentence.  *See* U.S.S.G. §1B1.13 cmt. n.1(D).

[10]*See generally Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC) (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited June 23, 2020).

correctional facility" would be "substantially diminishe[d]" and the inmate would "not [be] expected to recover." *See* U.S.S.G. § 1B1.13 cmt. n.1(A).  Lum founders on elements two and three.

First, Lum's health conditions do not increase his risk of becoming seriously ill if he contracts the virus.  The CDC has stated that individuals "at high-risk for severe illness from COVID-19" include those who: (i) are 65 years of age or older; (ii) are living in a nursing home or long-term care facility; (iii) have chronic lung disease or moderate to severe asthma; (iv) have serious heart conditions; (v) are immunocompromised; (vi) have "severe obesity (body mass index [BMI] of 40 or higher)"; (vii) have diabetes; (viii) have chronic kidney disease and are undergoing dialysis; or (ix) have liver disease.[11]  Lum does not fall into any of these categories.

Notably, Lum relies on the PSR and health records that pre-date his surrender to USP Lompoc.  *See* Dkt. No. 47-1 at 19–23; *cf.* Dkt. Nos. 38, 63.  These documents may or may not portray an accurate picture of Lum's current condition, which is Lum's burden to establish.  Even assuming, though, that his described condition has not changed, Lum does not fit within any of the categories of persons identified by the CDC as "at high-risk for severe illness."  Lum is currently 63 years of age. Nothing in the PSR or Lum's medical records indicates the severity of his asthma.

---

[11]*Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness*, CDC (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited June 23, 2020).

Lum recently had surgery in January 2020 to address atrial fibrillation (irregular heartbeat), which, according to Lum, "went well," and nothing in the record indicates that this condition has returned.  Dkt. No. 38, ¶ 65a.  Lum does not have "severe obesity" because his BMI is 32.1, below the threshold BMI for concern.  And, lastly, Lum is a "borderline" diabetic.  Dkt. No. 38 at 15.  Contrary to what Lum seems to suggest without any authority, his various conditions—none of which independently qualify as a CDC risk factor—cannot somehow be combined to suddenly transform him into an individual who is "at risk."  *See* Dkt. No. 47-1 at 19–23; Dkt. No. 56 at 11–12, 16.

Second, Lum has not shown that, should he contract the coronavirus, USP Lompoc is any less equipped to treat him than if he were not incarcerated.  Lum's blanket indictment of the BOP's efforts to curb the spread of the virus does not change that fact; that is a problem that also exists outside of correctional facilities.  Dkt. No. 47-1 at 17; Dkt. No. 56 at 3–9.  Nonetheless, in collaboration with the CDC and the World Health Organization (WHO), the BOP has taken extensive efforts to curtail the spread of the virus; including, *inter alia*, suspending social visits; suspending inmate transfers; testing inmates who arrive at a BOP facility; suspending legal visits (with some exceptions); implementing enhanced health screening of staff; quarantining symptomatic inmates; suspending tours; limiting inmates "in their movements to prevent congregate gathering and maximize social

distancing"; and completing an inventory of personal protective equipment at all BOP locations with the BOP continuing to "stockpile."[12]  As such, the BOP's preventive measures are as extensive, if not more, than those implemented in cities and states.  And nothing in the record establishes that Lum is not being properly cared for at USP Lompoc.  Conditions that can be managed in prison are not a basis for compassionate release.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A).

Further, contrary to Lum's contentions, those personnel at USP Lompoc with the unenviable task of simultaneously maintaining order and preventing the spread of the virus have thus far appeared to be successful in their efforts.  While Lum erroneously relies on coronavirus statistics across all BOP facilities, Dkt. No. 47-1 at 17; Dkt. No. 56 at 4, this high level of generality says nothing about the state of affairs at USP Lompoc, where Lum is housed.  USP Lompoc currently houses a total of 1,555 inmates (*i.e.*, 145 in one camp; 316 in the second camp; and 1,094 at the USP).[13]  As of the date of this Order, the BOP's coronavirus-related data for USP Lompoc indicates that there are: 7 inmates positive; 1 staff positive; 2 inmate deaths; 0 staff deaths; 167 inmates have recovered; and 23 staff have recovered.[14]  In other

---

[12]*See generally BOP Implementing Modified Operations*, BOP, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 23, 2020); *A BOP COVID-19 Overview*, BOP, https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response (last visited June 23, 2020).

[13]*USP Lompoc*, BOP, https://www.bop.gov/locations/institutions/lom/ (last visited June 23, 2020).

[14]*COVID-19 Coronavirus: COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited June 25, 2020).

words, the number of positive inmate cases at USP Lompoc is less than 0.5% of the inmate population.  Therefore, statistically, USP Lompoc is faring better than many cities and counties in California.[15]

Lum claims that the BOP is no longer updating the data on its website.  Dkt. No. 47-1 at 3.   But that is simply false.  The BOP website states that "the BOP will update the open COVID-19 confirmed positive test numbers, recoveries, and the number of COVID-19 related deaths daily at 3:00 p.m.," and because the BOP "has begun additional testing of asymptomatic inmates to assist in slowing transmissions within a correctional setting," the data is expected to reflect an increase in the number of COVID-19 positive tests.  *Id.*  However, the number of positive inmate cases reported at USP Lompoc has steadily *decreased* over the course of the briefing on Lum's motion. Dkt. No. 47-1 at 3; Dkt. No. 52 at 8; Dkt. No. 56 at 7.  Although Lum indicts these statistics as "misleading and incorrect" because not all inmates have been tested, the only alternative evidence Lum offers is unsubstantiated media reports and anecdotal accounts.  Dkt. No. 47-1 at 18–19; Dkt. No. 56 at 4–6, 8–9.  It is also true that not all members of the general public have been tested, yet the available numbers on those who have are routinely cited and used by governmental authorities responsible for planning measures designed to curb the virus's spread.

_____

[15]*See Cases by County*, CDC (June 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/county-map.html (last visited June 24, 2020) (noting cases per 100,000 residents).

Accordingly, Lum has not carried his burden of showing that there are "extraordinary and compelling reasons" to justify compassionate release under 18 U.S.C. § 3582(c)(1).

## II.   Section 3553(a) Factors and Risk of Danger to the Community

Even if extraordinary and compelling reasons supported compassionate release, the Court is not convinced the applicable factors in 18 U.S.C. § 3553(a) weigh in favor of reducing Lum's sentence or authorizing home confinement. *See* 18 U.S.C. § 3852(c)(1)(A). Dkt. No. 47-1 at 25; Dkt. No. 56 at 19–21.

Upon review of the relevant factors in Section 3553(a), Lum's 30-month sentence is, as it was at sentencing less than five months ago, "sufficient, but not greater than necessary, . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public." *See* 18 U.S.C. § 3553(a)(2). This conclusion is borne out when considering "the nature and circumstances" of Lum's offenses and Lum's "history and characteristics." *Id.* § 3553(a)(1).

After Lum's father passed away, and for a period of roughly three years, Lum continued to accept and convert for his personal use $33,435 of his father's Social Security benefits. Dkt. No. 27, ¶ 8(a). For seven years, Lum also failed to file a state or federal tax return, resulting in over $280,000 in unpaid taxes. Dkt. No. 38,

- 15 -

¶¶ 19, 23, 30; *see also* Dkt. No. 27, ¶ 8(a).  Lum's conviction for aggravated identity theft alone carried a mandatory minimum sentence of two years' imprisonment.  *See* 18 U.S.C. § 1028A(a)(1); U.S.S.G. § 2B1.6(a).  Yet, the Court imposed a sentence below the combined guideline range for both of Lum's offenses due to consideration of the Section 3553(a) factors and Lum's circumstances (*e.g.*, age, employment, family responsibilities, community contributions).  *See* Dkt. No. 42 at 3.  The Court was already aware of, and accounted for, the same health concerns Lum now raises.  The only new circumstances cited in Lum's motion (concern about the coronavirus pandemic) do not justify a further reduction in his sentence.  Although Lum did not commit a crime of violence, or a crime involving a minor or a weapon, such that the Court would consider Lum "a danger to the safety of any other person or the community,"[16] Lum has served less than four months of his 30-month sentence, having not been committed to pretrial detention nor surrendering for his instant detention until early March 2020.  Releasing him now would undoubtedly result in an "unwarranted sentence disparit[y] among defendants with similar records who have been found guilty of similar conduct."[17]  *See* 18 U.S.C. § 3553(a)(6).  Thus, as the Court found on January 29, 2020 when sentencing Lum, the Court concludes

---

[16]*See* 18 U.S.C. § 3142(g); 18 U.S.C. § 3582(c)(1); U.S.S.G. § 1B1.13.

[17]Doing so, for instance, would mean that Lum would not even come close to serving the mandatory minimum term of imprisonment for one of the two offenses to which he pled guilty. *See* Dkt. No. 27 at ¶¶ 4, 7(a).

today that 30 months' imprisonment is sufficient but not greater than necessary to achieve the statutory purposes of sentencing.

## CONCLUSION

For the reasons set forth herein, Lum's motion for compassionate release, Dkt. No. 47, is DENIED.

IT IS SO ORDERED.

DATED: June 25, 2020 at Honolulu, Hawaiʻi.



_____
Derrick K. Watson
United States District Judge

United States of America v. Nathan Yuen Grit Lum; Cr 18-00073 DKW;
**ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**